UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
SIEMENS GAMESA                )
RENEWABLE ENERGY A/S,         )
                              )
              Plaintiff,      )
                              )
         v.                   )      CIVIL ACTION
                              )      NO. 21-10216-WGY
GENERAL ELECTRIC CO.,         )
                              )
              Defendant.      )
_____)
```

YOUNG, D.J.                                    June 16, 2022

**FINDINGS AND RULINGS OF LAW**

## I.    INTRODUCTION

Siemens Gamesa Renewable Energy A/S ("SGRE") -- owner of
United States Patent No. 9,279,413 (the "'413 Patent") and
United States Patent No. 8,575,776 (the "'776 Patent") -- sued
General Electric ("GE") for infringement of each based on GE's
Haliade-X wind turbines.  First Am. Compl. Patent Infringement &
Jury Demand ("Compl.") ¶¶ 1, 23, 32, ECF No. 95; see generally
id. Ex. A, U.S. Patent No. 8,575,776 ("'776 Patent"), ECF No.
95-1; id. Ex. B, U.S. Patent No. 9,279,413, ECF No. 95-2.  GE
raised several counterclaims: (1) non-infringement of each
patent; (2) invalidity of each patent; and (3) unenforceability
of each patent based on inequitable conduct.  See Def.'s Second
Am. Answer, Affirmative Defs. & Countercls. Pl.'s First Am.
Compl. ("Answer & Countercls.") 19-31, ECF No. 98.

Specifically, in counts V and VI of its counterclaims GE alleges that Patents '776 and '413 are unenforceable on the basis of inequitable conduct by Siemens with the United States Patent Office ("USPTO" or "PTO") pursuant to 27 C.F.R. § 1.56. See id. 24-31.  As to the '776 Patent GE claims: (1) Henrik Stiesdal ("Stiesdal"), one of the named inventors of the '776 patent, was also an inventor of WO 2010/003868, WO 2010/003869, EP2143942A1 ("'941 reference"), EP2143942A1 ("'942 reference"), EP2143941A1 ("'944 reference"), and EP2182619A1 and thus knew of these patents; (2) all of these references are clearly material to the prosecution of '776 patent or are prior art; (3) Stiesdal and others intentionally withheld all of these references from the USPTO Examiner who was assessing the patentability of the '776 Patent with deliberate intent to deceive; and (3) therefore, the '776 Patent is unenforceable due to inequitable conduct. Id.  As to the '413 Patent GE incorporates by reference all of the allegations made regarding the '776 patent and adds that Siemens also made false statements regarding the conception and inventorship of the '413 patent.  See id.

Both parties moved for summary judgment on their respective claims and counterclaims.  See Def. GE's Mot. Summ. J. Non-Infringement Lack U.S. Act, ECF No. 148; Def. GE's Mot. Summ. J. Non-Infringement '776 Patent, ECF No. 157; Def. GE's Mot. Summ. J. Non-Infringement '413 Patent, ECF No. 169; Pl.'s Mot. Summ.

J. Certain References Do Not Constitute Prior Art, ECF No. 146; Pl.'s Mot. Summ. J. No Inequitable Conduct, ECF No. 141.  This Court denied all the motions for summary judgment.  See Electronic Clerk's Notes, ECF No. 305; April 4, 2022 Order, ECF No. 306.  SGRE's claims of infringement and GE's counterclaims of non-infringement and invalidity of the '413 and '776 Patent proceeded to jury trial.  See Electronic Clerk's Notes, ECF Nos. 335-36, 340, 342, 344, 347, 349-51.

This Court held a three-day bench trial on GE's inequitable conduct counterclaims.  See Electronic Clerk's Notes ECF Nos. 343, 350, 352. At the conclusion, this Court took the matter under advisement.

The Court now rules that GE has failed to meet its burden to prove inequitable conduct.

## II.  ANALYSIS

Both at trial and at the summary judgment stage SGRE argued that invention requires both conception and reduction to practice, and so joint inventorship existed for the '413 Patent. See Mem. Supp. Pl.'s Mot. Summ. J. No Inequitable Conduct ("Siemens Ineq. Cond. Mem.") 7-8, ECF No. 142.  As to both the '413 and the '776 Patents SGRE argued that GE has no evidence that Janet Hood ("Hood"), the SGRE patent agent involved in prosecuting the '776 patent, or Stiesdal had the specific intent to deceive in not disclosing the allegedly material references

[3]

and that Hood was unaware of at least one reference -- the '941 reference.  Id. 11.  Finally, Siemens argued, that GE lacked evidence that USPTO would not have allowed the patents, if provided with the allegedly relevant references.  Id. 15-16.

GE rebutted that the three inventors named on the '413 Patent are not joint inventors because there is no ascertainable collaboration among them.  GE's Mem. Opp'n No Prior Art 1-3. Essentially, GE argued, that SGRE relies on "a single, after-the-fact phone call orchestrated by the [SGRE] patent department, devoid of any collaboration, common direction, or awareness of the earlier work performed by others."  Id. 4.  GE also argued both Hood and Stiesdal were aware of the alleged material references, as Hood prosecuted other patents that cited these references and Stiesdal invented the references; thus, both were aware their materiality to the '776 Patent and intentionally failed to disclose them.  Id. 16-17.

### A.   Inequitable Conduct Generally

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. This judge-made doctrine evolved from a trio of Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011) (compiling cases).  "The remedy for inequitable conduct is

[known as] the 'atomic bomb' of patent law," because "inequitable conduct as to any individual claim renders the entire patent unenforceable.  Id. 1288-89.

Inequitable conduct includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive."  Bd. of Educ. ex rel. Bd. of Trustees of Fla. State Univ. v. Am. Bioscience, Inc., 333 F.3d 1330, 1343 (Fed. Cir. 2003).  The standard for establishing inequitable conduct is a demanding one:

> To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO.  The accused infringer must prove both elements -- intent and materiality -- by **clear and convincing evidence.**

Therasense, 649 F.3d at 1287 (internal citations omitted) (emphasis added).  Even if the accused infringer succeeds in both respects the district court still has the additional discretion to "weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable."  Id.  This is often framed as a two-step inquiry assessing the threshold levels of materiality and intent at step one and determining the totality of the circumstances at step two.  See PerSeptive Biosystems v. Pharmacia Biotech, 225 F.3d 1315, 1318-19 (Fed.Cir.2000).

"[T]he **materiality** required to establish inequitable conduct is but-for materiality." Therasense, 649 F.3d at 1291 (emphasis added). A reference is but-for material if the USPTO would not have allowed the claim had it been aware of the undisclosed prior art; the Court is to use the preponderance of the evidence standard and apply the broadest reading of the claims possible in making this determination. Id. at 1292; see also MONKEYmedia, Inc. v. Twentieth Century Fox Home Ent., LLC, 242 F. Supp. 3d 551, 554 (W.D. Tex. 2017) ("Information is 'material' for purposes of inequitable conduct 'if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent.'" (quoting Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 1000 (Fed. Cir. 2007))). "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct." GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed.Cir.2001). The fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct. Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008).

Inequitable conduct requires the **"specific intent** to . . . mislead[] or deceiv[e] the PTO." Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181 (Fed. Cir. 1995) (emphasis added). In

misrepresentation or omission a "gross negligence" or "should
have known" standard does not satisfy the requirement, instead
an accused infringer must show the patentee "made a deliberate
decision to withhold a known material reference." Therasense,
649 F.3d at 1290.  "[B]ecause direct evidence of deceptive
intent is rarely available, such intent can be inferred from
indirect and circumstantial evidence," however, "it must [] be
the single most reasonable inference able to be drawn from the
evidence to meet the **clear and convincing standard**." Star Sci.,
Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed.
Cir. 2008) (emphasis added).

GE alleges the following two actions constitute inequitable
conduct: (1) the representations of joint inventorship on the
'413 Patent and (2) the failure to disclose several references
during the prosecution of the both the '413 and the '776
Patents.  GE has failed to meet its burden as to either claim.

**B.   Inventorship**

Inventorship can be material, as it is "a critical
requirement for obtaining a patent." PerSeptive Biosystems,
Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321 (Fed. Cir.
2000).  Therefore, the only remaining questions are: (A)
whether the joint inventorship here was improperly represented;
and (B) whether there was intent to deceive in the
representations made to the USPTO.

### 1.   **Whether Inventorship was Improper**

Inventorship is a question of law.  <u>Hybritech Inc.</u> v.

<u>Monoclonal Antibodies, Inc.</u>, 802 F.2d 1367, 1376 (Fed.Cir.1986).

It is however premised on underlying questions of facts (and has

sometimes been referred to as a mixed question of law and fact).

<u>Eli Lilly & Co.</u> v. <u>Aradigm Corp.</u>, 376 F.3d 1352, 1362 (Fed. Cir.

2004).   "The inventors named in an issued patent are presumed

correct, and a party alleging misjoinder of inventors must prove

its case by clear and convincing evidence."  <u>Univ. of Pittsburgh</u>

<u>of Commonwealth Sys. of Higher Educ</u>. v. <u>Hedrick</u>, 573 F.3d 1290,

1297 (Fed. Cir. 2009).  Under 35 U.S.C. § 116 inventors may be

"joint inventors" even though:

> (1) they did not physically work together or at the same
> time, (2) each did not make the same type or amount of
> contribution, or (3) each did not make a contribution to
> the subject matter of every claim of the patent.

35 U.S.C. § 116.

"Conception is the touchstone of inventorship."  <u>Hedrick</u>,

573 F.3d at 1297.  "The test for conception is whether the

inventor had an idea that was definite and permanent enough that

one skilled in the art could understand the invention."  <u>Id.</u>

"Conception is the 'formation in the mind of the inventor, of a

definite and permanent idea of the complete and operative

invention, as it is hereafter to be applied in practice.'"

<u>Hybritech, Inc.</u> v. <u>Monoclonal Antibodies, Inc.</u>, 802 F.2d 1367,

1376 (Fed.Cir.1986) (quoting 1 Robinson on Patents 532 (1890)).

"If an inventor seeks the input or advice of another in reducing an invention to practice such input or advice does not automatically rise to the level of joint inventorship *. . . .* The analysis turns on whether that contribution contains the necessary element of 'conception' and thereby rises beyond the simple reduction to practice of the inventor's previously conceived idea." Murdock Webbing Co. v. Dalloz Safety, Inc., 213 F. Supp. 2d 95, 100 (D.R.I. 2002). One "who simply reduce[s] the inventor's idea to practice" or who provides "well-known principles or explains the state of the art" does not qualify as a joint inventor. Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998).

"Nevertheless, for the conception of a joint invention, each of the joint inventors need not make the same type or amount of contribution to the invention. Rather, each needs to perform only a part of the task which produces the invention." Id. (internal quotations and citations omitted). "Furthermore, a co-inventor need not make a contribution to every claim of a patent. A contribution to one claim is enough." Ethicon, 135 F.3d at 1460 (internal citations omitted). In fact, "the law of inventorship does not hinge co-inventor status on whether a person contributed to the conception of all the limitations in any one claim of the patent. Rather, the law requires only that

a co-inventor make a contribution to the conception of the
subject matter of a claim." Eli Lilly & Co. v. Aradigm Corp.,
376 F.3d 1352, 1361–62 (Fed. Cir. 2004).

It is true that, in order to prove contribution to
"conception" parties must establish "at least some quantum of
collaboration or connection." Kimberly–Clark Corp. v. Procter &
Gamble Distrib. Co., 973 F.2d 911, 917 (Fed. Cir. 1992).  "The
interplay between conception and collaboration requires that
each co-inventor engage with the other co-inventors to
contribute to a joint conception." Vanderbilt Univ. v. ICOS
Corp., 601 F.3d 1297, 1303 (Fed. Cir. 2010).  For there to be
collaboration "the inventors [must] have some open line of
communication during or in temporal proximity to their inventive
efforts." Eli Lilly, 376 F.3d at 1359.

At the same time, even minimal contacts have been deemed
sufficient to establish joint inventorship.  Examples of joint
behavior include: "collaboration or working under common
direction, one inventor seeking a relevant report and building
upon it or hearing another's suggestion at a meeting."  Id.
There is "no explicit lower limit on the quantum or quality of
inventive contribution required for a person to qualify as a
joint inventor." Id. at 1358.  Limited instances of
collaboration are enough, for example in one case joint
inventorship was found where:

[10]

Dr. Bass published an article explaining the capability to
mediate RNAi in mammals with dsRNA fragments having a 3'
overhang.  The named inventors read her article, and
incorporated her work. She also discussed her conception
with the named inventors at two conferences and over
dinner.

Univ. of Utah v. Max-Planck-Gesellschaft zur Forderung der

Wissenschaften E.V., 881 F. Supp. 2d 151, 158 (D. Mass. 2012).

It is clear that the collaboration need not be much:

The test [of joint inventorship] has been satisfied by such
tenuous collaborations as one inventor seeing the report of
another and building upon it, or merely hearing an
inventive suggestion at a meeting.  Accordingly, the Court
will assume that Kiefl has sufficiently pled a quantum of
collaboration between him and the named inventors of the
'276 Patent.

Arbitron, Inc. v. Kiefl, No. 09-CV-04013 PAC, 2010 WL 3239414,

at *6 (S.D.N.Y. Aug. 13, 2010).

Here, GE has adduced little to no evidence that

inventorship was improper.  At trial the following relevant

facts emerged from the testimony of several witnesses including

the inventors of the '413 patent.  Thomsen and Pedersen and

Ebbesen, respectively, created similar inventions that they

disclosed to SGRE via invention disclosure statements.  Before

submitting these invention disclosure statements Thomsen,

Ebbesen, and Pedersen did not have contact.  After submission of

these statements the SGRE Patent Office put the three inventors

in contact.  The inventors had at least one meeting at which

they discussed their inventions, but they remember little from

this meeting or what took place afterwards.  The '413 Patent was submitted with Thomsen, Pedersen, and Ebbesen listed as co-inventors.  The patent includes some drawing solely created by Ebbesen and some created solely by Thomsen and Pedersen.  Certain claims of the '413 Patent were contributed to solely by Thomsen and Pedersen and others solely by Ebbesen.

GE produced no evidence of what took place after the meeting between Thomsen, Ebbesen, and Pedersen, nor did it provide evidence to dispel the notion that the conception of different claims of the '413 patent are attributable to all of the inventors contributions together.  In fact, GE's expert, Professor Alexander Slocum, even seemed to suggest, that there are discernable differences between the work of the three inventors -- that Ebbesen created a rolling element bearing whereas Thomsen and Pedersen formulated a positioning for the bearing -- which would indicate key contributions by each to the final invention.  These facts do not establish clear and convincing evidence that inventorship was improperly represented.  They may even be sufficient to show that inventorship was proper, although this Court need not go so far in its analysis, as GE bears the burden on this issue to establish inequitable conduct and has failed to meet it.

At trial GE argued that Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co., constitutes a close parallel to the case at

bar.  973 F.2d 911, 917 (Fed.Cir.1992).  Kimberly-Clark dealt
with two patents involving baby diaper technology the first,
conceived in 1982 and patented in 1987, was the Enloe Patent
owned by Kimberly-Clark and the second, conceived in 1985 and
patented in 1987 was the Lawson Patent owned by P&G.  Id. at
912-13.  Kimberly-Clark accused P&G of infringing the Enloe
Patent and alleged that Enloe had priority over the Lawson
Patent.  Id. at 913.  P&G countered that the Enloe patent failed
to disclose the Lawson patent in its prosecution and thus was
invalid; it also requested that the district court order an
amendment in the Lawson Patent's inventorship to name two
additional inventors, Buell and Blevins, who had independently
developed the technology in the Lawson patent in 1979 and were
unaware of Lawson's work "until 1988 or 1989, long after the
Lawson Patent issued."  Id.  The district court did not find the
Enloe Patent invalid and held it had priority over the Lawson
Patent; it also found no inequitable conduct in the procurement
of the Enloe Patent.  Id.  The issue of inventorship in
Kimberly-Clark was relevant to the issue of **priority** not
**inequitable conduct**: essentially if Buell and Blevins had been
credited with joint inventorship the Lawson Patent would have
had an earlier priority date –- possibly 1979 –- and could have
beat the Enloe Patent for priority.  Id. at 915.  On appeal, the
Federal Circuit upheld the district court's holding that Buell

[13]

and Blevin were not joint inventors.  Id.  In doing so it
emphasized the district court's consideration that "Lawson
worked alone," "knew nothing" of Buell and Blevins's work, that
neither contributed anything to each other's work, and that
Buell and Blevins's work was not made public or even part of
development records or patent applications at the company.  Id.
The Federal Circuit's holding focused mostly on rejecting P&G's
broad and incorrect claim that the 1984 amendment to 35 U.S.C. §
116 eliminated any collaboration requirement.  Id.

The situation in Kimberly-Clark is clearly distinguishable
from the case at bar.  First, P&G was seeking to **add** inventors,
after the **publication** of a patent, who had never had any contact
prior to the patent's publication; furthermore, P&G only sought
to make this addition when it became useful to obtaining
priority of its patent against Kimberly-Clark's.  By contrast,
here, GE argues this Court ought **remove** inventors who were
introduced to one another and had definite contact **before** the
'413 Patent's issuance under the direction of their company,
SGRE.  GE has provided no rationale for why the addition of
Ebbesen (or Thomsen and Pedersen) was a desirable goal or how it
could have provided an outside benefit for SGRE or the
inventors, which could have motivated the alleged inequitable
conduct.

Finally, both parties spent much time debating at what point the invention was finalized.  SGRE argued that both conception and reduction to practice are required for invention -- and therefore that the '413 Patent is the relevant inventive act for the joint inventorship analysis.  GE argued that the invention disclosure statements -- independently provided by Ebbesen, and Thomsen and Pedersen, before the '413 Patent was drafted, filed, or issued are the inventions of interest.  This Court has so far considered inventive contributions to the '413 Patent for one simple reason: GE has not provided clear and convincing evidence that the invention disclosure statements are identical in terms of "conception" to one another or to the '413 Patent.  In fact, the inventors have provided compelling testimony to the contrary that different functions, parts of the specification, and elements of the claims were provided by the different inventors.  While reduction to practice is not the cornerstone of invention -- conception is -- GE has in no way made clear that the relevant conceptions are identical.

In short, the burden is on GE to establish that the inventors here were mistakenly joined and it has simply failed to meet it.  See Bd. of Educ. ex rel. Bd. of Trustees of Fla. State Univ. v. Am. Bioscience, Inc., 333 F.3d 1330, 1339 (Fed. Cir. 2003).

2.   **Intent**

Even assuming GE provided clear and convincing evidence of improper inventorship, GE nevertheless fails to establish inequitable conduct, as it has not provided sufficient evidence of intent to deceive the USPTO.  In determining whether the intent prong is met with regards to "failure to correctly name inventors" courts look to whether "the named inventors acted in bad faith or deceptive intent." Bd. of Educ. ex rel. Bd. of Trustees of Fla. State Univ. v. Am. Bioscience, Inc., 333 F.3d 1330, 1344 (Fed. Cir. 2003).  In fact, cases have found inequitable conduct where they can identify a "pattern of intentional conduct designed to deceive the attorneys and patent office." Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd., 292 F.3d 1363, 1376 (Fed. Cir. 2002).  The evidence of representations of improper inventorship "must be sufficient to require a finding of deceitful intent in the light of all the circumstances." Therasense, Inc., 649 F.3d at 1290 (quotations omitted).

GE provided no evidence of improper intent except for showing that Thomsen, Ebbesen and Pedersen signed an attestation affirming joint inventorship and claiming that this attestation was false.  As testified at trial Thomsen, Ebbesen, and Pedersen are inventors, they live abroad, they work abroad, and they rely at least in part, on the SGRE infrastructure, to facilitate

acquiring patents in the United States.  There are many reasons why they may have signed such an attestation (even taking for granted _arguendo_ its falsehood), ranging from carelessness to good faith.  It is simply not the "single most reasonable inference able to be drawn from the evidence," _Star Sci._, 537 F.3d at 1366, that the attestation was signed in bad faith. Particularly when GE has not identified any potential benefit the inventors would have obtained by misstating inventorship. In fact, the common case of inequitable conduct dealing with inventorship involves inventors **excluding** a joint inventor, to reap the spoils of the patent amongst fewer benefactors.  See, e.g., _Frank's Casing Crew_, 292 F.3d at 1376.

Furthermore, the inequitable conduct analysis focuses not only on the fact of inventorship itself, but also statements and representations as to inventorship made to the USPTO.  See _PerSeptive Biosystems, Inc._ v. _Pharmacia Biotech, Inc._, 225 F.3d 1315, 1322 (Fed. Cir. 2000).  Here, GE points to no independent statements made to the USPTO beyond the attestation of joint inventorship attached to the patent.  The inquiry therefore rises and falls on whether GE has provided clear and convincing evidence of improper inventorship.  Here it has failed to do so.

**C.   Allegedly Material References**

**1.   Materiality**

Failure to disclose prior art can be material.  See Ring Plus, Inc. v. Cingular Wireless Corp., 614 F.3d 1354, 1360 (Fed. Cir. 2010).  A prior art reference is "but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."  Therasense, 649 F.3d at 1291.  "In determining the materiality of a reference, the court applies the preponderance of the evidence standard and gives claims their broadest reasonable construction."  Regeneron Pharms., Inc. v. Merus N.V., 864 F.3d 1343, 1350–51 (Fed. Cir. 2017).

A reference is "**not** material for the purpose of inequitable conduct if it is merely cumulative," see Dig. Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1319 (Fed. Cir. 2006), and a reference is cumulative if it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO."  Regents of the Univ. of Calif. v. Eli Lilly & Co., 119 F.3d 1559, 1575 (Fed. Cir. 1997).  It ought be noted, "prior art need not be invalidating to be material."  Informatica Corp. v. Bus. Objects Data Integration, Inc., 489 F. Supp. 2d 1060, 1070 (N.D. Cal. 2007).  "Information concealed from the PTO "may be material even though it would not invalidate the patent."  Leviton Mfg. Co. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1359 (Fed. Cir. 2010).

Here, GE has adduced some evidence that material references were not provided to the USPTO.  This Court need not resolve if

[18]

it reaches the level of clear and convincing, however, because GE has failed to establish clear and convincing evidence of the specific intent to deceive.

### 2. Intent

As to the intent prong "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." Therasense, 649 F.3d at 1290. "[C]lear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." Id. (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181 (Fed. Cir. 1995)) (internal quotation marks omitted). "[A] failure to disclose a prior art device to the PTO, where the only evidence of intent is a lack of a good faith explanation for the nondisclosure, cannot constitute clear and convincing evidence sufficient to support a determination of culpable intent." M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., 439 F.3d 1335, 1341 (Fed. Cir. 2006). A Court can infer intent to deceive if presented with "a pattern of lack of candor." Apotex Inc. v. UCB, Inc., 763 F.3d 1354, 1362 (Fed. Cir. 2014). Intent to deceive also cannot be de facto linked to an individual being "experienced" in the field of patents and made a mistake in filing. See Outside the Box Innovations, LLC v. Travel Caddy, Inc., 695 F.3d 1285, 1294 (Fed. Cir. 2012)

[19]

(objecting to district court's ruling that "experienced" attorney had committed inequitable conduct by failing to properly assert proper small entity status).  Nevertheless, it can be considered when, taken with all of the evidence, it appears to demonstrate an intent to deceive.  For example, in one case an "experienced" patent attorney was found to have engaged in inequitable conduct where:

> An experienced patent prosecutor drafted the claims for two co-pending applications, listing entirely different inventors, within months of one another and thus was intimately familiar with their nearly indistinguishable claims.

Leviton Mfg. Co., 606 F.3d at 1371.

Here, GE has established at most what the Federal Circuit has expressly delineated is insufficient to prove intent.  It has **attempted to show** that Stiesdal and Hood knew of the references, that the references were material, and that the references were not submitted to the USPTO.  See Therasense, 649 F.3d at 1290.  GE did not establish a pattern of lack of candor, nor did it identify any evidence indicative of any specific intent to deceive by either Stiesdal or Hood.  It has attempted to demonstrate intent via circumstantial evidence, but failed in that respect as well.

While a bad faith explanation for Stiesdal's failure to disclose the allegedly material references is plausible, many other explanations are possible, and more likely.  In light of

the fact that the '776 Patent is just one of the many (around forty-five) patents Stiesdal has obtained for technology pertinent to wind turbine generators, it is far more probable that he simply forgot to cite the references or that he was aware of the references and believed, in good faith, they were not material.

GE argues Hood's intent is demonstrated by her expertise and her awareness of at least two of the allegedly material references -- the '942 and '944 references.  This attempt fails for several reasons.  First, GE attempted to establish that Hood was aware of several material references -- the '942 and '944 references -- because patent examiners at the USPTO identified these references when she was prosecuting certain patents in the United States.  Hood testified that these identifications by the USPTO are often glossed over unless they materialize into an office action and require patent modification by the prosecuting patent agent.  Given that, alongside the volume of patents Hood prosecuted during the period, it is possible, if not likely, that she could have simply missed either seeing or assessing the importance of the references.  Second, GE argued Hood should have been aware of these references given she prosecuted the United States counterparts of some of them.  Hood testified at trial that she had no reason to look to the European counterparts with specificity.  Third, GE argued that Hood's

decision to take the '776 Patent's prior art references, disclosed by the European inventors, at face value and failure to add any additional references shows intent to deceive.  Hood testified that her general approach with foreign patent prosecution was to trust the credible and often complete prior art cited by the foreign inventors.

Establishing intent via expertise and a failure to disclose requires all of the evidence to indicate that deceptive intent is the most logical or supported explanation for a behavior. See Leviton Mfg. Co., 606 F.3d at 1371.  Here, there are many other logical explanations that are more likely, given the evidence: (1) Hood saw the references and in good faith did not believe them to be relevant; (2) Hood did not see the references -- whether by negligence in her patent prosecution or because it was common practice; or (3) Hood saw the references, believed them to be relevant, but negligently left them off due to the volume of patents she was processing.  GE did not demonstrate why these patents would be so obviously similar that Hood should immediately connect one to the other.  Furthermore, it identified no reason why Hood would be compelled or even willing to make misrepresentations on a patent application, risking her license as a patent agent and her livelihood, when SGRE provided no incentive -- financial or otherwise -- for her to secure more patents rather than fewer.

**III. CONCLUSION**

Accordingly, this Court rules in favor of SGRE on the issue of inequitable conduct (counts V and VI of GE's counterclaims).


**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[1]

---

[1] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.