UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
————————————————————————
                            )
SIEMENS GAMESA              )
RENEWABLE ENERGY A/S,       )
                            )
            Plaintiff,      )
                            )
       v.                   )      CIVIL ACTION
                            )      NO. 21-10216-WGY
GENERAL ELECTRIC CO.,       )
                            )
            Defendant.      )
————————————————————————
```

YOUNG, D.J.                                    July 27, 2022


**AMENDED FINDINGS AND RULINGS OF LAW**

## I.    INTRODUCTION

Siemens Gamesa Renewable Energy A/S ("SGRE") –– owner of
United States Patent No. 9,279,413 (the "'413 Patent") and
United States Patent No. 8,575,776 (the "'776 Patent") –– sued
General Electric ("GE") for infringement of each based on GE's
Haliade-X wind turbines.  First Am. Compl. Patent Infringement &
Jury Demand ¶¶ 1, 23, 32, ECF No. 95; see generally id. Ex. A,
U.S. Patent No. 8,575,776 ("'776 Patent"), ECF No. 95-1; id. Ex.
B, U.S. Patent No. 9,279,413, ECF No. 95-2.  GE raised several
counterclaims: (1) non-infringement of each patent; (2)
invalidity of each patent; and (3) unenforceability of each
patent based on inequitable conduct.  See Def.'s Second Am.

Answer, Affirmative Defs. & Countercls. Pl.'s First Am. Compl. 19-31, ECF No. 98.

Specifically, counts V and VI of GE's counterclaims allege that the '776 and '413 Patents are unenforceable on the basis of inequitable conduct by SGRE with the United States Patent and Trademark Office (the "PTO") under 27 C.F.R. § 1.56.  See id. 24-31.  As to the '776 Patent, GE claims: (1) Henrik Stiesdal ("Stiesdal"), one of the named inventors of the '776 Patent, was also an inventor, and thus had knowledge, of WO 2010/003868, WO 2010/003869, EP2143941A1 (the "'941 reference"), EP2143942A1 (the "'942 reference"), EP2143944A1 (the "'944 reference"), and in addition was aware of EP2182619A1; (2) all of these references are clearly material to the prosecution of '776 patent or are prior art; (3) Stiesdal and others intentionally withheld all of these references from the PTO Examiner who was assessing the patentability of the '776 Patent with deliberate intent to deceive; and (4) therefore, the '776 Patent is unenforceable due to inequitable conduct.  Id.  As to the '413 Patent GE incorporates by reference all of the allegations made regarding the '776 Patent and adds that SGRE also made false statements regarding the conception and inventorship of the '413 Patent.  See id.

Both parties moved for summary judgment on their respective claims and counterclaims.  See Def. GE's Mot. Summ. J. Non-

Infringement Lack U.S. Infringing Act, ECF No. 148; Def. GE's Mot. Summ. J. Non-Infringement '776 Patent, ECF No. 157; Def. GE's Mot. Summ. J. Non-Infringement '413 Patent, ECF No. 169; Pl.'s Mot. Summ. J. Certain References Do Not Constitute Prior Art, ECF No. 146; Pl.'s Mot. Summ. J. No Inequitable Conduct, ECF No. 141.  This Court denied all the motions for summary judgment.  See Electronic Clerk's Notes, ECF No. 305; April 4, 2022 Order, ECF No. 306.  SGRE's claims of infringement and GE's counterclaims of non-infringement and invalidity of the '413 and '776 Patent proceeded to jury trial.  See Electronic Clerk's Notes, ECF Nos. 335, 336, 340, 342, 344, 347, 349-51, 359, 360, 362, 372, 374, 375.

This Court held a three-day bench trial on GE's inequitable conduct counterclaims.  See Electronic Clerk's Notes ECF Nos. 343, 350, 352.  At the conclusion, this Court took the matter under advisement.

The Court now rules that GE has failed to meet its burden to prove inequitable conduct.

## II.  ANALYSIS

At trial and at the summary judgment stage, GE argued that the three inventors named on the '413 Patent are not joint inventors because there is no ascertainable collaboration among them.  Mem. Opp'n SGRE's Mot. Summ. J. No Inequitable Conduct 1-3, ECF No. 187.  Essentially, GE asserted that SGRE relies on "a

single, after-the-fact phone call orchestrated by the [SGRE]
patent department, devoid of any collaboration, common
direction, or awareness of the earlier work performed by others"
to prove its representations of joint inventorship are proper.
Id. 4.  GE also posited that both Janet Hood ("Hood"), the SGRE
patent agent involved in prosecuting the '776 patent, and
Stiesdal were aware of the alleged material references, as Hood
prosecuted other patents that cited these references and
Stiesdal invented the references; thus, both had knowledge of
their materiality to the '413 and '776 Patents and intentionally
failed to disclose them.  Id. 16-17.

     As to the '413 Patent, SGRE rebutted that invention
requires both conception and reduction to practice and that
sufficient interactions took place prior to the latter step in
the '413 Patent, so joint inventorship was properly represented
to the PTO.  See Mem. Supp. Pl.'s Mot. Summ. J. No Inequitable
Conduct 7-8, ECF No. 142.  As to both the '413 and '776 Patents,
SGRE argued that GE has no evidence that Hood or Stiesdal had
the specific intent to deceive in not disclosing the allegedly
material references, and that Hood was unaware of at least one
reference -- the '941 reference.  Id. 11, 14-15.  Furthermore,
SGRE asserted that GE lacked evidence that the PTO would not
have allowed the patents if provided with the allegedly relevant
references.  Id. 12-13.

In concluding that GE has not met its burden on its inequitable conduct counterclaim, this Court: (A) provides an overview of the inequitable conduct doctrine; (B) assesses GE's claims as to joint inventorship of the '413 Patent; and (C) considers GE's arguments as to non-disclosure of material references, relevant to both the '413 and '776 Patents.

**A. Inequitable Conduct Generally**

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. This judge-made doctrine evolved from a trio of Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011) (compiling cases). "The remedy for inequitable conduct is [known as] the 'atomic bomb' of patent law," because "inequitable conduct as to any individual claim renders the entire patent unenforceable." Id. at 1288-89.[1]

---

[1] As the Federal Circuit cautions, courts "must be vigilant in not permitting the defense to be applied too lightly" because "[j]ust as it is inequitable to permit a patentee who obtained his patent through deliberate misrepresentations or omissions of material information to enforce the patent against others, it is also inequitable to strike down an entire patent where the patentee only committed minor missteps or acted with minimal culpability or in good faith." Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008).

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." Board of Educ. ex rel. Bd. of Trustees of Fla. State Univ. v. Am. Bioscience, Inc., 333 F.3d 1330, 1343 (Fed. Cir. 2003). The standard for establishing inequitable conduct is a demanding one:

> To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. The accused infringer must prove both elements -- intent and materiality -- by **clear and convincing evidence.**

Therasense, 649 F.3d at 1287 (internal citations omitted) (emphasis added). Even if the accused infringer succeeds in both respects the district court "must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." Id. This is often framed as a two-step inquiry assessing the threshold levels of materiality and intent at step one and determining the totality of the circumstances at step two. See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, 225 F.3d 1315, 1318-19 (Fed.Cir.2000).

"[T]he **materiality** required to establish inequitable conduct is but-for materiality." Therasense, 649 F.3d at 1291 (emphasis added). A reference is but-for material if the PTO

would not have allowed the claim had it been aware of the undisclosed prior art; the Court is to use the preponderance of the evidence standard and apply the broadest reading of the claims possible in making this determination.  Id. at 1292; see also MONKEYmedia, Inc. v. Twentieth Century Fox Home Ent., LLC, 242 F. Supp. 3d 551, 554 (W.D. Tex. 2017) ("Information is 'material' for purposes of inequitable conduct 'if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent.'" (quoting Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 1000 (Fed. Cir. 2007))).  "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct."  GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed.Cir.2001).  "[T]he fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct."  Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008).

To successfully level an inequitable conduct defense the accused infringer must also show the plaintiff had the "**specific intent** to . . . mislead[] or deceiv[e] the PTO."  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181 (Fed. Cir. 1995) (emphasis added).  In a misrepresentation or omission case, a "gross

[7]

negligence" or "should have known" standard does not satisfy the requirement, instead an accused infringer must show the patentee **"made a deliberate decision** to withhold a known material reference." Therasense, 649 F.3d at 1290 (quoting Molins, 48 F.3d at 1181). "Because direct evidence of deceptive intent is rare, [the Court] may infer intent from indirect and circumstantial evidence. However, to meet the **clear and convincing** evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" Id. (emphasis added) (citations omitted) (quoting Star Sci., Inc., 537 F.3d at 1366).

GE alleges the following two actions constitute inequitable conduct: the representations of joint inventorship on the '413 Patent and the failure to disclose several references during the prosecution of the both the '413 and '776 Patents. GE has failed to meet its burden as to either claim.

**B. Inventorship**

Inventorship can be material because it is "a critical requirement for obtaining a patent." PerSeptive Biosystems, 225 F.3d at 1321. Therefore, the only remaining questions are: (1) whether the joint inventorship here was improperly represented; and (2) if so, whether those misrepresentations were made with intent to deceive in the PTO.

### 1. Whether Inventorship was Improper and thus Misrepresented to the PTO

"Inventorship is a mixed question of law and fact: The overall inventorship determination is a question of law, but it is premised on underlying questions of fact." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1362 (Fed. Cir. 2004). "The inventors named in an issued patent are presumed correct, and a party alleging misjoinder of inventors must prove its case by clear and convincing evidence." Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009). Under 35 U.S.C. § 116 inventors may be "joint inventors" even though:

> (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

35 U.S.C. § 116.

"Conception is the touchstone of inventorship." Hedrick, 573 F.3d at 1297. "The test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention." Id. Conception has also been described as "the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986) (quoting

1 Robinson on Patents 532 (1890)).  "If an inventor seeks the
input or advice of another in reducing an invention to practice
such input or advice does not automatically rise to the level of
joint inventorship. . . . The analysis turns on whether that
contribution contains the necessary element of 'conception' and
thereby rises beyond the simple reduction to practice of the
inventor's previously conceived idea." Murdock Webbing Co. v.
Dalloz Safety, Inc., 213 F. Supp. 2d 95, 100 (D.R.I. 2002).  One
who simply reduce[s] the inventor's idea to practice" or
"provides the inventor with well-known principles or explains
the state of the art" does not qualify as a joint inventor.
Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456,
1460 (Fed. Cir. 1998).

        "Nevertheless, for the conception of a joint invention,
each of the joint inventors need not make the same type or
amount of contribution to the invention.  Rather, each needs to
perform only a part of the task which produces the invention."
Id. (internal quotations and citations omitted).  "Furthermore,
a co-inventor need not make a contribution to every claim of a
patent.  A contribution to one claim is enough."  Id. (internal
citations omitted).  In fact, "the law of inventorship does not
hinge co-inventor status on whether a person contributed to the
conception of all the limitations in any one claim of the
patent.  Rather, the law requires only that a co-inventor make a

[10]

contribution to the conception of the subject matter of a claim." Eli Lilly, 376 F.3d at 1361-62.

It is true that, in order to prove contribution to "conception," the purported inventors must engage in "at least some quantum of collaboration or connection." Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co., 973 F.2d 911, 917 (Fed. Cir. 1992). "The interplay between conception and collaboration requires that each co-inventor engage with the other co-inventors to contribute to a joint conception." Vanderbilt Univ. v. ICOS Corp., 601 F.3d 1297, 1303 (Fed. Cir. 2010). For there to be collaboration "the inventors [must] have some open line of communication during or in temporal proximity to their inventive efforts." Eli Lilly, 376 F.3d at 1359.

At the same time, even minimal contacts have been deemed sufficient to establish joint inventorship. Examples of joint behavior include: "collaboration or working under common direction, one inventor seeking a relevant report and building upon it or hearing another's suggestion at a meeting." Id. There is "no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." Id. at 1358. Limited instances of collaboration are enough. For example, another session of this Court held that the following allegation, if true, would "meet the requirements of joint inventorship":

[11]

> Dr. Bass published an article explaining [her
> invention] . . . The named inventors read her article,
> and incorporated her work. She also discussed her
> conception with the named inventors at two conferences
> and over dinner.

University of Utah v. Max-Planck-Gesellschaft zur Forderung der

Wissenschaften E.V., 881 F. Supp. 2d 151, 158 (D. Mass. 2012)

(Saris, J.).  Another Court, in discussing inventorship at the

motion to dismiss stage explained:

> The test [of joint inventorship] has been satisfied by such
> tenuous collaborations as one inventor seeing the report of
> another and building upon it, or merely hearing an
> inventive suggestion at a meeting.  Accordingly, the Court
> will assume that Kiefl has sufficiently pled a quantum of
> collaboration between him and the named inventors of the
> '276 Patent.

Arbitron, Inc. v. Kiefl, No. 09-CV-04013 PAC, 2010 WL 3239414,

at *6 (S.D.N.Y. Aug. 13, 2010) (internal citations omitted).

Here, GE has adduced insufficient evidence that

inventorship was improper and thus misrepresented to the PTO.

At trial the following relevant facts emerged from the testimony

of several witnesses, including the inventors of the '413

Patent.  Thomsen and Pedersen, and Ebbesen, respectively,

created similar inventions that they disclosed to SGRE via

invention disclosure statements.  See Jury Trial Tr. vol. II

119:12-120:3, June 2, 2022, ECF No. 386.  Before submitting

these invention disclosure statements, Thomsen and Pedersen, and

Ebbesen did not communicate about their respective inventions or

the fluid film bearings project on which Thomsen and Pedersen

were staffed.  Id. 120:7-17.  After submission of these statements, the SGRE Patent Office put the three inventors in contact.  See id. 120:18-121:9.  The inventors had at least one meeting at which they discussed their inventions, but they remember little of this meeting or what took place afterwards. See Bench Trial Tr. 79:16-19, June 8, 2022, ECF No. 397; Jury Trial Tr. vol. II 121:2-9, June 2, 2022 (explaining that the inventors likely discussed their inventions, once informally, prior to the meeting and then at the meeting organized by the SGRE Patent Office).  The '413 Patent was submitted with Thomsen, Pedersen, and Ebbesen listed as co-inventors.  See Bench Trial Tr. 71:25-72:1, June 8, 2022.  The patent includes some drawings solely created by Ebbesen and some solely created by Thomsen and Pedersen.  See Jury Trial Tr. vol. II 137:21-138:25, June 6, 2022, ECF No. 391 (discussing which figures were contributed by Ebbesen and which were contributed by Thomsen and Pedersen to the '413 Patent).  The '413 Patent also contains certain claims contributed solely by Thomsen and Pedersen and others solely by Ebbesen.  See Bench Trial Tr. 73:21-74:4, June 8, 2022 (stating that Thomsen and Pedersen crafted Claim 4 and clarifying that Ebbesen did not contribute to that claim).

GE produced no evidence of what took place after the meeting between Thomsen, Ebbesen, and Pedersen, nor did it provide evidence to dispel the notion that, taken together, all

[13]

of the claims of the '413 Patent are attributable to all of the inventors' conceptions and contributions.  In fact, GE's expert, Professor Alexander Slocum, even seemed to suggest that there are discernable differences between the work of the three inventors -- that Ebbesen created a rolling element bearing part whereas Thomsen and Pedersen formulated a single sliding bearing positioned towards the center of the hollow chamber -- which, if anything, indicates key contributions by each to the final invention.  <u>See</u> Bench Trial Tr. 22:3-24:12, June 8, 2022.  These facts do not establish by clear and convincing evidence that inventorship was improper and thus misrepresented to the PTO.

At trial, GE argued that <u>Kimberly-Clark Corp</u>. v. <u>Procter & Gamble Distributing Co.</u> constitutes a close parallel to the case at bar.  973 F.2d at 911.  <u>Kimberly-Clark</u> dealt with two patents involving baby diaper technology: the first, conceived in 1982 and patented in 1987, was the Enloe Patent owned by Kimberly-Clark; and the second, conceived in 1985 and patented in 1987, was the Lawson Patent owned by Proctor & Gamble ("P&G").  <u>Id.</u> at 912-13.  Kimberly-Clark accused P&G of infringing the Enloe Patent and alleged that the Enloe Patent had priority over the Lawson Patent.  <u>Id.</u> at 913.  P&G countered that the Enloe Patent failed to disclose the Lawson Patent in its prosecution and thus was invalid; it also requested that the district court order an amendment in the Lawson Patent's inventorship to name two

additional inventors, Buell and Blevins, who had independently developed the technology in the Lawson Patent in 1979.  Id.  The district court did not find the Enloe Patent invalid and held it had priority over the Lawson Patent; it also found no inequitable conduct in the procurement of the Enloe Patent.  Id. The issue of inventorship in Kimberly-Clark was relevant to the issue of **priority** not **inequitable conduct**: essentially, if Buell and Blevins had been credited with joint inventorship of the Lawson Patent, the Lawson Patent would have had an earlier priority date –- possibly 1979 -- and could have beaten the Enloe Patent for priority.  Id. at 915.  On appeal, the Federal Circuit upheld the district court's holding that Buell and Blevins were not joint inventors with Lawson.  Id.  In doing so, it emphasized the district court's consideration that "Lawson worked alone," "knew nothing" of Buell and Blevins's work, and that Buell and Blevins's work was not made public or even part of development records or patent applications at the company. Id.  It further noted that Buell had been unaware of Lawson's work "until 1988 or 1989, long after the Lawson Patent issued" and that neither Buell and Blevins, nor Lawson, contributed anything to each other's work.  Id. at 913, 915.  The Federal Circuit's holding focused mostly on rejecting P&G's broad and incorrect claim that the 1984 amendment to 35 U.S.C. § 116 eliminated any collaboration requirement.  Id.

[15]

The situation in Kimberly-Clark is clearly distinguishable from the case at hand.  First, P&G was seeking to **add** inventors, who had never had any contact prior to the patent's publication, **after the publication** of the patent; furthermore, P&G only sought to make this addition when it became useful to obtaining priority of its patent against Kimberly-Clark's.  By contrast, here, GE argues this Court ought **remove** an inventor, who was introduced to and had definite contact with the named co-inventors **before** the '413 Patent's issuance, under the direction of his employer, SGRE.  Furthermore, GE has provided no rationale for why the addition of Ebbesen (or Thomsen and Pedersen) was a desirable goal, or how it could have provided an outside benefit for SGRE or the inventors, that could motivate the alleged inequitable conduct.

Both parties spent much time debating at what point the invention was finalized.  SGRE argued that both conception and reduction to practice are required for invention -- and therefore that the '413 Patent is the relevant inventive act for the joint inventorship analysis.  GE argued that the invention disclosure statements -- independently provided by Ebbesen, and Thomsen and Pedersen, before the '413 Patent was drafted, filed, or issued -- are essentially the inventions of interest.  This Court has so far considered inventive contributions to the '413 Patent, because GE has not provided clear and convincing

[16]

evidence that the invention disclosure statements are identical in terms of "conception" to one another or to the '413 Patent. In fact, the inventors have provided compelling testimony to the contrary that different functions, parts of the specification, and elements of the claims were provided by each inventor. While reduction to practice is not the cornerstone of invention -- conception is -- GE has in no way made clear that the relevant conception was not jointly created.

In short, the burden was on GE to establish that the inventors here were mistakenly joined and it has simply failed to meet it.  See Am. Bioscience, 333 F.3d at 1339.

### 2. Intent

Even had GE provided clear and convincing evidence of improper inventorship -- it has not -- GE would nevertheless fail to establish inequitable conduct, as it has not presented sufficient evidence of intent to deceive the PTO.  In assessing the intent prong with regard to "failure to correctly name inventors," courts look to whether "the named inventors acted in bad faith or with deceptive intent."  Id. at 1344.  In fact, some courts have found inequitable conduct where they can identify a "pattern of intentional conduct designed to deceive the attorneys and patent office."  Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd., 292 F.3d 1363, 1376 (Fed. Cir. 2002).  The evidence of representing improper inventorship to

the PTO "must be sufficient to require a finding of deceitful intent in the light of all the circumstances." Therasense, 649 F.3d at 1290 (quotations omitted).

GE provided no evidence of improper intent except for showing that Thomsen, Ebbesen, and Pedersen signed an attestation affirming joint inventorship and claiming that this attestation was false.  As they testified at trial, Thomsen, Ebbesen, and Pedersen are inventors who live abroad, work abroad, and rely at least in part on the SGRE infrastructure to facilitate acquiring patents in the United States.  There are many reasons why they may have signed such an attestation -- even taking for granted arguendo its falsehood -- ranging from carelessness to good faith.  It is simply not the "single most reasonable inference able to be drawn from the evidence," Star Sci., 537 F.3d at 1366, that the attestation was signed in bad faith, particularly where GE has not identified any potential benefit the inventors would have obtained by misstating inventorship.  In fact, the common case of inequitable conduct dealing with inventorship involves inventors **excluding** a joint inventor to reap the spoils of the patent amongst fewer benefactors.  See, e.g., Frank's Casing Crew, 292 F.3d at 1376.

Furthermore, the inequitable conduct analysis focuses not only on the fact of inventorship itself, but also statements and representations as to inventorship made to the PTO.  See

[18]

PerSeptive Biosystems, 225 F.3d at 1322.  Here, GE points to no independent statements made to the PTO beyond the attestation of joint inventorship attached to the patent.  The inquiry therefore rises and falls on whether GE has provided clear and convincing evidence of improper inventorship.  Here, it has failed to do so.

### C. Allegedly Material References

#### 1. Materiality

Failure to disclose prior art can be material.  See Ring Plus, Inc. v. Cingular Wireless Corp., 614 F.3d 1354, 1360 (Fed. Cir. 2010).  A prior art reference is "but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."  Therasense, 649 F.3d at 1291.  "In determining the materiality of a reference, the court applies the preponderance of the evidence standard and gives claims their broadest reasonable construction."  Regeneron Pharms., Inc. v. Merus N.V., 864 F.3d 1343, 1350–51 (Fed. Cir. 2017).

A reference is "**not** material for the purpose of inequitable conduct if it is merely cumulative," see Digital Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1319 (Fed. Cir. 2006), and a reference is cumulative if it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO," Regents of the Univ. of Calif. v. Eli Lilly & Co., 119 F.3d 1559, 1575 (Fed. Cir. 1997).  It ought be

noted, "prior art need not be invalidating to be material."
Informatica Corp. v. Bus. Objects Data Integration, Inc., 489 F.
Supp. 2d 1060, 1070 (N.D. Cal. 2007). "Information concealed
from the PTO 'may be material even though it would not
invalidate the patent.'" Leviton Mfg. Co. v. Universal Sec.
Instruments, Inc., 606 F.3d 1353, 1359 (Fed. Cir. 2010) (quoting
Larson Mfg. Co. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1327
(Fed. Cir. 2009)).

Here, GE has adduced some evidence that material references
were not provided to the PTO. This Court need not resolve if it
reaches the level of clear and convincing, however, because GE
has failed to establish clear and convincing evidence of the
specific intent to deceive.

### 2. Intent

As to the intent prong "[p]roving that the applicant knew
of a reference, should have known of its materiality, and
decided not to submit it to the PTO does not prove specific
intent to deceive." Therasense, 649 F.3d at 1290. "[C]lear and
convincing evidence must show that the applicant **made a
deliberate decision** to withhold a **known** material reference."
Id. (quoting Molins, 48 F.3d at 1181). A Court can infer intent
to deceive if presented with "a pattern of lack of candor."
Apotex Inc. v. UCB, Inc., 763 F.3d 1354, 1362 (Fed. Cir. 2014).
"[A] failure to disclose a prior art device to the PTO, where

the only evidence of intent is a lack of a good faith explanation for the nondisclosure," however "cannot constitute clear and convincing evidence sufficient to support a determination of culpable intent." M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., 439 F.3d 1335, 1341 (Fed. Cir. 2006).  Intent to deceive also cannot be de facto linked to an individual being "experienced" in the field of patents and making a mistake in filing.  See Outside the Box Innovations, LLC v. Travel Caddy, Inc., 695 F.3d 1285, 1294 (Fed. Cir. 2012) (overturning the district court's ruling that an "experienced" attorney had committed inequitable conduct by failing to properly assert small entity status).

Here, GE has established, at most, what the Federal Circuit has expressly deemed insufficient to prove intent.  It has **attempted to show** that Stiesdal and Hood knew of the references, that the references were material, and that the references were not submitted to the PTO.  See Therasense, 649 F.3d at 1290.  GE did not establish a pattern of lack of candor, nor did it identify sufficient evidence to indicate a specific intent to deceive by either Stiesdal or Hood.  It has attempted to demonstrate intent via circumstantial evidence but failed in that respect as well.

While a bad faith explanation for Stiesdal's failure to disclose the allegedly material references is plausible, many

[21]

other explanations are possible, and more likely.  In light of
the fact that the '776 Patent is just one of the many (around
forty-five) patents Stiesdal has obtained for technology
pertinent to wind turbine generators, see Jury Trial Tr. vol. I
58:14-15, June 2, 2022, it is far more probable that he simply
forgot to cite the references or that he was aware of the
references and believed, in good faith, they were not material.

GE argues Hood's intent is demonstrated by her expertise
and her awareness of several material references -- including
the '942 and '944 references.  This argument fails for several
reasons.  First, GE attempted to establish that Hood was aware
of several material references because patent examiners at the
PTO identified these references when she was prosecuting other
patents in the United States.  See Jury Trial Tr. vol. III
147:4-20, June 9, 2022, ECF No. 400.[2]  Hood testified that these
identifications by the PTO are often glossed over unless they
materialize into an office action and require patent
modification by the prosecuting patent agent.  See id. 147:13-
148:9; 165:12-25; 166:24-169:1.  Given that fact, alongside the
volume of patents Hood prosecuted during the relevant period, it
is possible, if not likely, that she could have simply missed

---

[2] Although titled "Jury Trial Day 8 Part 3" on the docket,
this document transcribes Day 3 of the Bench Trial on June 9,
2022.

either seeing or assessing the importance of certain references.

Second, GE argued Hood should have been aware of these

references given she prosecuted the United States counterparts

of some of them.  See id. 141:10-146:6.  Hood, however, provided

credible testimony that she did not intentionally withhold the

'941, '942, and '944 references. Id. 178:10-179:3.  Third, GE

argued that Hood's decision to take the '776 Patent's prior art

references, disclosed by the European inventors, at face value

and her failure to add any supplementary references shows intent

to deceive.  See id. 159:2-24.  Hood testified that her general

approach with foreign patent prosecution was to trust the

credible and often complete prior art cited by the foreign

inventors.  See id. 176:12-178:4.

An individual's failure to disclose a material reference,

alongside evidence of her "experience and knowledge" in the

field of patent prosecution, is not enough to support the

existence of inequitable conduct, without a further finding of

intent to deceive.  See Leviton Mfg. Co., Inc., 606 F.3d at 363

(overturning a grant of summary judgment on the issue of

inequitable conduct, which had been based in part on a patent

attorney's experience and knowledge).  Here, there are many

other logical explanations for Hood's failure to disclose the

relevant references, that are more likely than her possessing an

intent to deceive: (1) Hood saw the references and in good faith

did not believe them to be relevant; (2) Hood did not see the references -- whether by negligence in her patent prosecution or because it was common practice; or (3) Hood saw the references, believed them to be relevant, but negligently left them off due to the volume of patents she was processing.  GE did not sufficiently demonstrate why these patents would be so obviously similar that Hood should immediately connect one to the other.  Furthermore, it identified no reason why Hood would be compelled or even willing to make misrepresentations on a patent application, risking her license as a patent agent and her livelihood, when SGRE provided no incentive -- financial or otherwise -- for her to secure more patents rather than fewer.  See Jury Trial Tr. vol. III 180:20-181:11, June 9, 2022.

## III. CONCLUSION

Accordingly, this Court rules in favor of SGRE on the issue of inequitable conduct (counts V and VI of GE's counterclaims).

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[3]

---

[3] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.